IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT SCHEALL, | ) | Case No. 1:19-CV-2435 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Robert Scheall, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Scheall's applications for DIB and SSI be AFFIRMED.

## II.     Procedural History

On November 30, 2016, Scheall applied for DIB and SSI.  (Tr. 365-79).  Scheall alleged that he became disabled on September 29, 2016, due to "depression; anxiety; chronic diarrhea; lumbar degenerative disc disease; degenerative joint disease, hips; diabetes; sleep apnea; hypogonadism; hypothyroidism; [and] obesity."  (Tr. 233, 250, 365, 372, 399).  The Social

Security Administration denied Scheall's claims initially and upon reconsideration.

(Tr. 230-302).  Scheall requested an administrative hearing.  (Tr. 333-34).  ALJ William Leland

heard Scheall's case on July 11, 2018, and denied the claim in a September 12, 2018, decision.

(Tr. 13-36, 164-209).  On August 26, 2019, the Appeals Counsel denied review, rendering the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).  On October 18, 2019, Scheall

filed a complaint to obtain judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Scheall was born on October 29, 1967, and he was 48 years old on the alleged onset date.

(Tr. 365).  He had a high school education, but he had been in special education classes

throughout school.  (Tr. 173).  The ALJ determined that he was not able to perform any of his

past relevant work (grinder operator, crater, and production assembler) and that transferability of

job skills was irrelevant.  (Tr. 29-30).

### B.    Relevant Medical Evidence

#### 1.    Physical Health Treatment Records

On September 16, 2015, David Novak, MD, conducted a colonoscopy on Scheall.

(Tr. 466-67).  Dr. Novak determined that Scheall had two polyps and mild diverticulosis in his

colon.  (Tr. 467).  Dr. Novak recommended that Scheall take one scoop of Miralax each day

because he had overflow diarrhea based on his abdominal imaging.  (Tr. 467).

On October 17, 2016, Scheall cancelled an appointment with his primary care physician,

Sandra Berglund, MD, due to diarrhea.  (Tr. 487).  At the rescheduled appointment on

October 24, 2016, Dr. Berglund noted that Scheall had elbow pain, said that he had fallen

downstairs, and reported increased anxiety.  (Tr. 487).  At a follow-up on December 20, 2016,

Scheall told Dr. Bergland he'd had knee pain and muscle spasms, and he requested physical therapy.  (Tr. 486).  Scheall cancelled another appointment with Dr. Berglund on September 12, 2017, due to diarrhea.  (Tr. 717).

On January 16, 2017, Scheall saw Nicole Scherry, PT, for physical therapy.  (Tr. 463-65, 542-44).  Scherry noted that Scheall had lower back pain and knee pain that had begun four or five years earlier and was aggravated by a fall one year earlier.  (Tr. 463, 542).  Scheall said that he had tried pain injections and physical therapy without success.  (Tr. 463, 542).  Scheall was discharged from physical therapy on May 15, 2017.  (Tr. 599-601, 616-18).  At discharge, Steven Gay, PT, noted that Scheall's prognosis was poor and his treatment goals were abandoned due to noncompliance.  (Tr. 599-601, 616-18).

On January 31, 2017, Scheall saw Edmond Blades, MD, for diarrhea.  (Tr. 491-93). Dr. Blades noted that he had treated Scheall "more than 9 years ago" for the same condition, but "[n]othing was found at the time" other than his "significant psychosocial and psychiatric problems."  (Tr. 491).   Scheall reported having 4-5 loose stools per day, incontinence, passing gas when changing positions, depression, anxiety, agoraphobia, and weight gain.  (Tr. 491-92). On examination, Scheall had normal bowel sounds, a normal abdomen, no noted symptoms in his extremities, a normal gait, normal reflexes, and intact sensation.  (Tr. 492-93).  Dr. Blades determined that Scheall could have a "possible obstipation," and scheduled him for blood work, a KUB, a cleanout, a colonoscopy, and an EGD.  (Tr. 493).  Dr. Blades conducted the colonoscopy on May 12, 2017 and found that Scheall's colon appeared normal except for "mild diverticulosis in the sigmoid colon and in the descending colon."  (Tr. 521-23, 605-07, 621-23). At a follow-up on August 22, 2017, Dr. Blades noted that the cause of Scheall's diarrhea was still not determined and that "15 years ago . . . [i]t was determined he had stress-induced

diarrhea." (Tr. 691).  Scheall told Dr. Blades that he didn't leave the house due to his diarrhea and fecal incontinence and that he had tried to kill himself twice. (Tr. 691).  Dr. Blades stated that it was "[s]till not clear if [Scheall's diarrhea was] organic or psychologic," and he ordered additional testing. (Tr. 692).

On April 20, 20217, Scheall told Kenneth Grimm, MD, that he had pain in his lower back and bilateral lower extremities. (Tr. 788).  Scheall said that his pain was "most notable" when performing chores, with prolonged walking, when waking up, with weather changes, and when transitioning between positions. (Tr. 788).  His pain improved with rest. (Tr. 788).  Physical therapy, epidural steroid injections, ice/heat, and over-the-counter topical agents did not help his pain. (Tr. 788).  Scheall said that he was compliant with a home exercise program, which included daily limited stretching exercises. (Tr. 788).  He also denied neurogenic bowel or bladder changes. (Tr. 788).  Scheall denied having any sleep disturbance, mood disorder, or psychosocial stressors. (Tr. 790).  On examination, Scheall's posture was fair, he had no noted symptoms in his abdomen, he had facet joint tenderness in his L4-5 and L5-S1 areas, and he had marked hamstring and piriformis tightness bilaterally. (Tr. 790).  Dr. Grimm diagnosed Scheall with lumbosacral pain (possible lumbar spondylosis, degenerative disc disease, or lumbar facet syndrome); agoraphobia; depression; anxiety; morbid obesity; diabetes mellitus; and hypothyroidism. (Tr. 790).  Dr. Grimm encouraged Scheall to continue his home exercise program and scheduled him for an MRI. (Tr. 790).  Dr. Grimm also referred Scheall to the Bariatric Institute. (Tr. 790).

Scheall had his MRI on May 31, 2017. (Tr. 795-96).  Doksu Moon, MD, noted that all of the spinal spaces appeared patent, but that Scheall had "mild" hypertrophic changes in the L5-S1 facet joints. (Tr. 796).  At a June 14, 2017 follow-up with Dr. Grimm, Scheall agreed to

proceed with bilateral L4-5, L5-SA zygapophyseal joint injections.  (Tr. 798).  Scheall had the injection on July 18, 2017.  (Tr. 802, 820-21).  At a follow-up on August 10, 2017, Scheall told Dr. Grimm that his pain had improved by approximately 70% for the first four days after the procedure but had later returned to baseline.  (Tr. 802).  Scheall said he had increased pain with weightbearing activity, and that sitting and lying down helped his pain.  (Tr. 802).  Scheall also said that he continued to perform home exercises 3 to 4 times weekly.  (Tr. 802).  On examination, Scheall had a broad-based gait and 1/5 Waddell signs.  (Tr. 805).  Dr. Grimm diagnosed Scheall with low back pain due to mechanical-lumbar facet syndrome-myofascial. (Tr. 805).

On September 29 and December 12, 2017, Dr. Grimm performed L4-5, L5-S1 medial branch nerve/L5 dorsal ramus radiofrequency ablation.  (Tr. 822-25).  At a follow-up on January 17, 2018, Dr. Grimm noted that Scheall did not have any benefit from the procedure and continued to have axial low-back pain throughout the day.  (Tr. 809).  Scheall denied any specific motor or sensory changes.  (Tr. 809).  Physical examination showed symmetric and full strength in the upper and lower extremities, diffusely increased thoracolumbar tissue tension, no facet joint tenderness, level iliac crests, equal leg lengths, and intact sensation.  (Tr. 812). Dr. Grimm referred Scheall to a chronic pain rehabilitation program.  (Tr. 812).

## 2.      Mental Health Treatment Records

From February 16, 2017, through March 27, 2018, Scheall had 16 counseling and behavioral therapy sessions with Cynthia Toncler, LISW.  (Tr. 634-64, 740-80, 841-50).  At intake, Toncler noted that Scheall had been diagnosed with chronic diarrhea, moderate recurrent major depression, and anxiety with somatization.  (Tr. 634, 636).  Throughout his treatment with Toncler, Scheall described having: (1) anxiety related to family/financial stress, the fear that his

inability to control bowel movements would lead to frequent accidents if he was away from his home, and fear of judgment from others if he had a diarrhea accident; (2) PTSD, vivid nightmares, and anger related to a history of physical abuse (father had hit him with a 2x4 and woke him to beat him) and sexual abuse (father had attempted to force him to perform oral sex at 14); (3) depression leading to daily suicidal thoughts, two suicide attempts a year before he started treatment with Toncler, and one attempt in June 2017.  (Tr. 640, 642, 646, 655, 740, 750, 755, 760, 770, 775, 841, 846).  Throughout his treatment, Scheall frequently missed appointments and group therapy sessions because he was afraid that he would have an accidental bowel movement.  (Tr. 755, 775).

Toncler's examinations showed that Scheall's affect ranged from being: (1) agitated, incongruent, anxious, or constricted on April 19 and 27, June 29, August 2 and 24, October 12, and December 19, 2017, and February 8 and March 27, 2018; and (2) congruent, pleasant, or appropriate on February 16, March 28, May 24, June 15, July 29, and September 12, 2017, and March 1, 2018.  (Tr. 634-64, 740-80, 841-50).  He generally had cooperative and appropriate behavior, but he had anxious or agitated behavior on June 29 and August 2, 2017, and February 8, 2018.  (Tr. 634-64, 740-80, 841-50).  He generally had an anxious, angry, agitated, or incongruent mood, but he had a euthymic mood on May 24, June 15, and September 12, 2017, and March 27, 2018.  (Tr. 634-64, 740-80, 841-50).  Scheall ordinarily had coherent thought content and intact thought processes, but he had: (1) destructive thoughts on March 28, 2017; (2) ideas of reference on April 19, 2017; (3) tangential thoughts on February 16, 2017, and March 1, 2018; and (4) loose associations on March 28 and April 19, 2017.  (Tr. 634-64, 740-80, 841-50).  His concentration was typically preoccupied, but he had focused concentration on June 15, June 29, and September 12, 2017.  (Tr. 634-64, 740-80, 841-50).  Each time Toncler

evaluated Scheall's memory and judgment, she found that Scheall's memory was intact, his judgment was poor, and he was capable of reality-based thinking.  (Tr. 634-64, 740-80, 841-50).

On February 16, 2017, Scheall told Toncler that he was being treated for possible IBS, colitis, diverticulitis, or Crohn's; on June 15, 2017, he said that his diarrhea was due to IBS and diverticulitis and that stress made it worse; and on September 12, 2017, Scheall said he was frustrated because doctors had not found a cause for his bowel incontinence.  (Tr. 640, 660, 760). He also said that his fear of incontinence made him afraid to try pool-based physical therapy, which he needed for his knees and back, and he refused to use adult diapers out of pride. (Tr. 640, 660).  On April 27, 2017, Scheall said that he was trying to take better care of his health, had no suicidal thoughts despite having a stressful week, and tried to reduce his sugar addiction by cutting back on soda; on June 15, 2017 he said that he was less depressed; and on October 12, 2017, he said that he had successfully reduced soda consumption from 2 cases per day to 2 bottles per day.  (Tr. 650, 660, 765).  On July 20, 2017, testing showed severe depression, but Scheall said that he was surprised because he felt like he was doing better, had less frequent suicidal thoughts with his medication, and used distraction tools to keep his mind busy.  (Tr. 745)  Scheall indicated that his score might be have been the result of his problems with reading comprehension.  (Tr. 745).  On August 2, 2017, Scheall reported increased anxiety (7-8 out of 10) and fear related to his bowel incontinence, and Toncler encouraged him to train his brain to be less afraid by engage in activities rather than avoiding them.  (Tr. 750).  On March 27, 2018, Scheall said that he stopped taking his medication (prazosin) because he continued to have nightmares and panic episodes.  (Tr. 846).

On March 9, 2017, Scheall saw Thomas Thysseril, MD, to establish medication management care for his depression.  (Tr. 563-68, 586-91).  Scheall told Dr. Thysseril that he

was previously prescribed Effexor for his depression and Trazadone for his sleep issues. (Tr. 563-64).  Scheall also said that he felt depressed and hopeless, spent his days doing chores, had feelings of guilt, was easily angered, had flashbacks to traumas after he quit using drugs in his early 20s, was an overeater, and had "a lot of stomach issues; colitis."  (Tr. 563-64).  On examination, Scheall had cooperative behavior, anxious affect, helpless thought process, a desire to control his anger, suicidal and homicidal ideation, alert cognition, intact memory, and fair judgment.  (Tr. 566-67).  Dr. Thysseril diagnosed Scheall with moderate recurrent major depression, obesity, diabetes mellitus, and assigned a GAF score of 65.  (Tr. 567).  Dr. Thysseril prescribed an increased dosage of Effexor and added Rexulti.  (Tr. 567).

On March 31, 2017, Scheall told Dr. Thysseril that he had run out of medication and had increased anger problems.  (Tr. 581).  Examination showed cooperative behavior, dysphoric/anxious mood, reactive affect, coherent thought process, angry/preoccupied thought content, suicidal and homicidal ideation, alert cognition, intact memory, fair impulse control/insight/judgment.  (Tr. 583-84).  Dr. Thysseril added generalized anxiety disorder and impulse control disorder to Scheall's diagnoses, continued his Effexor, and added atenolol. (Tr. 584-85).

On July 6, 2017, Dr. Thysseril noted that Scheall was somatically preoccupied with his diarrhea and back pain, stayed at home, and had occasional death wishes.  (Tr. 665). Dr. Thysseril also noted that Scheall refused inpatient treatment, refused help, blamed others for his problems, and did not want to do anything to help himself.  (Tr. 665).  On examination Scheall had a depressed mood, irritable affect, semi-cooperative behavior, tangential thought process, preoccupied thought content, suicidal and homicidal ideation, alert cognition, intact memory, and fair impulse control/insight/judgment.  (Tr. 666-67).  Dr. Thysseril added

8

personality disorder to his diagnoses, continued his Effexor, and added gabapentin and Risperdal to his medications.  (Tr. 669).

On July 17, 2017, Scheall told Dr. Thysseril that he was doing better, spent his time remodeling his basement, and had not had any suicidal thoughts since his last appointment. (Tr. 670).  He also said that he went shopping with his wife and did chores at home.  (Tr. 670). Dr. Thysseril noted that Scheall did not complain about any somatic symptoms other than his back pain.  (Tr. 670).  On examination, Scheall had a depressed mood, restricted affect, semi-cooperative behavior, coherent thought processes, suicidal and homicidal ideation, alert cognition, intact memory, and fair impulse control/insight/judgment.  (Tr. 672-73).

On July 17, 2017, Scheall saw Mariene Kurz, PCC-S, for an evaluation pending admission to an intensive outpatient program at the request of Dr. Thysseril.  (Tr. 689).  Kurz noted that Scheall was "very negative about the assessment," and that he said he would not attend if he did not like the program and that he did not like sharing personal information with a stranger.  (Tr. 689).  Kurz noted that Scheall was anxious, depressed, had decreased sleep, had feelings of worthlessness, and had impaired concentration.  (Tr. 689).  Kurz also noted that Scheall felt like he couldn't go anywhere, and that he "often ha[d] a bowel movement in a public place which he f[ound] embarrassing." (Tr. 676, 689).

On October 3, 2017, Scheall told Dr. Thysseril that his mood remained the same, he was less anxious, and epidural injections made his back feel "slightly better but not completely normal."  (Tr. 708).  Scheall said that he spent his day doing chores, was compliant with his medications, and did not have any mood swings or anger problems.  (Tr. 708).  Dr. Thysseril noted that Scheall was "still somatically preoccupied with his incontinence and back pain." (Tr. 708).  On examination, Scheall had semi-cooperative behavior, depressed mood, restricted

affect, coherent thought process, suicidal and homicidal ideation, alert cognition, intact memory, and fair impulse control/insight/judgment.  (Tr. 710, 712).  Dr. Thysseril gave Scheall a GAF score of 70.  (Tr. 711).

On December 22, 2017, Dr. Thysseril noted that Scheall was partially compliant with his medications, and he was "less preoccupied with somatic problems."  (Tr. 830).  Scheall denied having any suicidal or homicidal thoughts, mood swings, or racing thoughts.  (Tr. 830).  On examination, Scheall had semi-cooperative behavior, depressed mood, restricted affect, coherent thought process, alert cognition, intact memory, and fair impulse control/insight/judgment. (Tr. 831-32).

On March 16, 2018, Scheall told Dr. Thysseril that he had an appointment for an exercise program, he had been compliant with his medication, and that counseling was helping.  (Tr. 834). Dr. Thysseril noted that Scheall was "still somatically preoccupied with the diarrhea and the back pain."  (Tr. 834).  On examination, Scheall had semi-cooperative behavior, anxious mood, restricted affect, tangential thought process, alert cognition, intact memory, and fair impulse control/insight/judgment.  (Tr. 835-36).

### C.    Relevant Opinion Evidence

#### 1.    Consultative Mental Health Examiner – Deborah Koricke, Ph.D.

On March 3, 2015, Deborah Koricke, Ph.D., examined Scheall and evaluated his mental capacity on referral from the Opportunities for Ohioans with Disabilities Division of Disability Services.  (Tr. 445).  Scheall told Dr. Koricke that he had chronic diarrhea and was given several diagnoses, including colitis, Crohn's disease, and IBS.  (Tr. 447).  Scheall said that he had depression due to his deteriorated health and inability to work, and that he had stopped counseling because he didn't like his counselor.  (Tr. 447).  Scheall said that he typically felt sad

and angry, isolated himself, had no social interest, thought about suicide all the time, frequently cried at "stupid things," and felt hopeless.  (Tr. 447-49, 451).  He said that he did not do much around the house and rested most of the day.  (Tr. 449-50).  He denied having any fears, phobias, panic attacks, nightmares, or flashbacks.  (Tr. 449).

On examination, Scheall ambulated independently, but exhibited pain with movement. (Tr. 448).  He appeared withdrawn and depressed, appeared embarrassed about his functioning, and cried intermittently.  (Tr. 448, 449).  He had no difficulty communicating but had problems with sustained attention.  (Tr. 449).  Scheall's memory was good, and he had average intellectual functioning.  (Tr. 450).  His depressed mood was "in the severe range."  (Tr. 451).

Dr. Koricke opined that Scheall would have "some difficulty"  understanding complex and multi-step instructions due to his depression and attention lapses, even though he had adequate memory, no comprehension issues, and average intelligence.  (Tr. 451-52).  He had variable attention/concentration, slow pace due to lack of motivation and depression, and would have difficulty responding appropriately to supervision and coworkers.  (Tr. 452).  Scheall did not have effective coping skills to manage his emotions, and work pressures could increase his depression.  (Tr. 453).

### 2.       Consultative Mental Health Examiner – Charles Misja, MD

On March 10, 2017, Charles Misja, MD, examined Scheall and evaluated his mental capacity on referral from the Opportunities for Ohioans with Disabilities Division of Disability Services.  (Tr. 554-60).  Scheall told Dr. Misja that chronic diarrhea and knee issues prevented him from working.  (Tr. 555).  Scheall said that he was stressed, depressed, and angry.  (Tr. 555). Scheall said that he had been diagnosed with IBS and diverticulosis, and that he had past diagnoses of Crohn's disease and chronic diarrhea.  (Tr. 555).  Scheall reported that he had

difficulty leaving his house because he sometimes didn't make it to the restroom on time and he was not comfortable around a lot of people.  (Tr. 555-56).  Scheall said that his counseling was "working out adequately."  (Tr. 556).  Scheall said that he understood his job when he was working, didn't require much supervision, liked fast-pace work with a heavy workload, and could do anything someone showed him how to do.  (Tr. 556).  Scheall said that he did not belong to any groups, had a few friends, bathed every day, did dishes, vacuumed, mowed his lawn, tinkered in his garage, slept poorly, and watched a lot of TV.  (Tr. 557).

On examination, Scheall was friendly, chatty, "almost jovial," and communicated without any pathology.  (Tr. 557).  He had a constricted affect, depressed mood, and anxiety.  (Tr. 558).  He reported having panic attacks, severe sleep problems, and low energy.  (Tr. 558).  He had no bizarre or unusual thought content, low-average intelligence, and fair insight/judgment.  (Tr. 558-59).  Dr. Misja opined that Scheall would able to understand, remember, and implement ordinary instructions.  (Tr. 560).  He had minimal limitations in attention, concentration, pace, responding appropriately to supervision and coworkers, and responding appropriately to work pressures.  (Tr. 560).

### 3.    Consultative Physical Examiner – Freeland Ackley, MD

On March 18, 2017, Freeland Ackley, MD, examined Scheall and evaluated his physical capacity on referral from the Opportunities for Ohioans with Disabilities Division of Disability Services.  (Tr. 570-79).  Dr. Ackley noted that Scheall had normal memory, concentration, range of motion, coordination, gait, and strength.  (Tr. 571-72, 574, 576-79).  He could lift, carry, and handle light objects.  (Tr. 573).  He had no joint swelling, erythema, effusion, tenderness, or deformity.  (Tr. 573).  He could sit for more than an hour, stand for an hour at a time, walk for an

hour at a time, and lift over 20 pounds.  (Tr. 574).  Dr. Ackley opined that Scheall was able to

perform daily living activities without any difficulty.  (Tr. 574).

### 4.    Treating Counselor - Cynthia Toncler, LISW

On February 8, 2018, Toncler completed a "mental impairment questionnaire," and noted

that she had not seen Scheall in two years  (Tr. 782-85).  Toncler wrote that "[p]hysical problems

cause [mental health] symptoms and anxiety worsens physical symptoms; causing difficulty with

leaving the house."  (Tr. 782).  Toncler opined that Scheall did not have reduced intellectual

functioning.  (Tr. 783).  In response to whether Scheall's psychiatric condition exacerbated his

physical symptoms, Toncler wrote "increased anxiety causes/worsens bowel problems."

(Tr. 783).  She indicated that Scheall had "none-mild" limitations in: (1) understanding,

remembering, or applying information; (2) maintaining concentration, persistence, or pace; and

(3) adapting or managing himself.  (Tr. 783).  He had "moderate" limitations in interacting with

others.  (Tr. 783).  Toncler indicated that Scheall's conditions included anhedonia, suicidal

thoughts, feelings of guilt/worthlessness, impaired impulse control, generalized persistent

anxiety, mood disturbance, intrusive recollections of a traumatic experience, persistent

disturbances of mood or affect, emotional lability, maladaptive behavior patterns, emotional

withdrawal or isolation, and inappropriate suspiciousness or hostility.  (Tr. 784).

### 5.    State Agency Consultants

On March 17, 2017, state agency consultant Kristen Haskins, Psy.D., evaluated Scheall's

mental capacity based on a review of the medical record and adopted the September 2016 RFC

finding that Scheall was:

> limited to simple, routine, and repetitive tasks.  He is not able to perform at a
> production rate pace (e.g., assembly line work) but can perform goal-oriented
> work (e.g., office cleaner).  He is limited to simple work-related decisions.  The
> claimant is limited to occasional interaction with coworkers, and occasional

superficial interaction with the public.  He is limited to tolerating few changes in a routine work setting, and when said changes do occur, they would need to take place gradually and occur infrequently.

(Tr. 245).  On June 7, 2017, Robyn Murry-Hoffman, Ph.D., concurred, adding that Scheall alleged no changes in his condition, daily living activities, or a new diagnosis.  (Tr. 281).

On April 3, 2017, Teresita Cruz, MD, evaluated Scheall's physical capacity based on a review of the medical record.  (Tr. 243-44).  Dr. Cruz indicated that Scheall could lift up to 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for up to 6 hours each in an 8-hour workday, and was unlimited in pushing and pulling.  (Tr. 243).  Dr. Cruz adopted the September 2016 RFC finding that Scheall was able to:

perform less than the full range of light work as defined in 20 CFR 404.1567(b). Specifically, the claimant can occasionally use ramps and stairs, but can never use ladders, ropes or scaffolds.  He can occasionally balance, kneel, stoop, crouch and crawl.  He is restricted from hazards, such as heights or machinery, but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles.

(Tr. 244).  On June 11, 2017, Leslie Green, MD, concurred, adding that: (1) Scheall had alleged no changes in his condition, daily living activities, or new physical diagnosis; (2) a colonoscopy showed mild diverticulosis; (3) notes showed that he chose to discontinue rehabilitation and that his physical therapy goals were abandoned due to noncompliance.  (Tr. 280).

### D.    Prior ALJ Finding

On September 28, 2016, ALJ Keith Kearney issued a written decision finding that Scheall was not disabled from October 30, 2014, through the date of his decision, and denying Scheall's October 2014 applications for DIB and SSI.  (Tr. 213-25).  In doing so, ALJ Kearney found that Scheall had the RFC to perform a reduced range of light work, except that:

the claimant can occasionally use ramps and stairs, but can never use ladders, ropes or scaffolds.  He can occasionally balance, kneel, stoop, crouch and crawl. He is restricted from hazards, such as heights or machinery, but is able to avoid

> ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles. The claimant is limited to simple, routine, and repetitive tasks. He is not able to perform at a production rate pace (e.g., assembly line work) but can perform goal-oriented work (e.g., office cleaner). He is limited to simple work-related decisions. The claimant is limited to occasional interaction with coworkers, and occasional superficial interaction with the public. He is limited to tolerating few changes in a routine work setting, and when said changes do occur, they would need to take place gradually and occur infrequently.

(Tr. 217). In making this finding, ALJ Kearney noted that Scheall had said his "primary barrier to work is chronic diarrhea of an undetermined etiology;" that he had argued his gastrointestinal symptoms stemmed from stress; that his bathroom trips interfered with attendance when he tried to work; and that he believed he would miss up to 15 days of work per month due to his gastrointestinal and mental symptoms. (Tr. 218).

### E.   Relevant Testimonial Evidence

Scheall testified at the ALJ hearing. (Tr. 169-97). Scheall said that he sometimes left the house on the weekend with his wife, but he didn't go anywhere during the week unless he had to. (Tr. 171). He said he went to the grocery store, but he would lean against the shopping cart or rode in a motorized cart. (Tr. 172). Scheall said that he could sit for about 20 minutes before he had to stand and stretch due to discomfort, he could stand for five minutes, and he could walk for eight minutes. (Tr. 177). He said he could lift five pounds comfortably, but he lost his balance when he tried carrying things. (Tr. 179). He did not have any difficulty remembering to perform self-care. (Tr. 179). Scheall had a work friend who stopped over about once a month, but he did not visit his friends. (Tr. 179, 196). He typically spent his day doing chores like folding laundry, doing dishes, vacuuming, and mowing the lawn, but he also spent some days resting. (Tr. 181, 189). Scheall said he didn't have any hobbies, he would forget what he read, and he couldn't concentrate for two hours to watch a movie. (Tr. 181). He said that he had put together

15

furniture the April before the hearing, but it took him six months because he had days when he

didn't feel like doing anything.  (Tr. 183).

Scheall said he could not work because he had chronic diarrhea keeping him homebound

and constant back pain.  (Tr. 174, 176).  Scheall tried taking Imodium for his diarrhea, but he

stopped taking it because he believed it didn't work and his doctor thought it made him

constipated.  (Tr. 185).  Changing his diet hadn't helped.  (Tr. 191).  He also had pain in his

knees and legs due to arthritis.  (Tr. 178).  He took OxyContin for his pain, but not all the time

because he didn't like the way it felt.  (Tr. 174-75).  He said his pain was worse when he moved,

and that he had to take many breaks when doing chores like dishes and mowing the lawn.  (Tr.

175).  He sometimes used ibuprofen for his pain, but he didn't think it helped.  (Tr. 176).  Scheall

said that he did not go to vocational rehabilitation after his attorney referred him to it because he

felt like his diarrhea and mental stress would prevent him from going.  (Tr. 184).  Scheall also

said that he had nightmares and woke up having injured himself.  (Tr. 184, 195).  Scheall said

that he believed his mental symptoms had become worse due to home and financial stress, and

that his diarrhea prevented him from exercising or doing physical therapy to improve his

physical condition.  (Tr. 187-88).  He said that counseling did not help.  (Tr. 193).  Scheall

testified that, when he last worked, he would miss two or three days or weeks at a time, and that

he only worked about 130 days out of the year due to calling off.  (Tr. 197).

Daniel Samoni, a vocational expert ("VE"), also testified at the ALJ hearing.

(Tr. 199-204).  The ALJ told the VE to assume that Scheall's past work included grinder

operator (medium work), crater (medium work, light work as performed), and production

assembler (light work).  (Tr. 200).  The ALJ asked whether a hypothetical individual with

Scheall's age and experience could work if he were limited to:

> light, occasional climbing of ramps and stairs, never to climb ladders, ropes, or
> scaffolds, occasional balance, stoop, kneel, crouch, crawl, never to be exposed to
> unprotected heights, moving mechanical parts, or operate a motor vehicle.  The
> mental limitations as follows, limited to performing simple, routine, and repetitive
> tasks, but not at a production rate pace, i.e. assembly line work, limited to simple,
> work-related decisions in using his judgment, and dealing with changes in the
> work setting, able to occasionally interact with supervisors, coworkers, and the
> public.

(Tr. 200-01).  The VE said that such an individual could not perform Scheall's past work, but

could work as an inspector and hand packager, cafeteria attendant, or housekeeping cleaner.

(Tr. 201-02).  The ALJ asked if work would be available if the individual were limited to:

> light, except the hypothetical individual can occasionally use ramps and stairs, but
> can never use ladders, ropes, or scaffolds, he can occasionally balance, kneel,
> stoop, crouch, and crawl.  He is restricted from hazards such as heights or
> machinery, but is able to avoid ordinary hazards in the workplace such as boxes
> on the floor, doors ajar, or approaching people or vehicles.  The hypothetical
> individual is limited to simple, routine, and repetitive tasks, he is not able to
> perform at a production rate pace, i.e. assembly line work, but can perform
> goal-oriented work, i.e. office cleaner.  He is limited to simple, work-related
> decisions.  He is limited to occasional interaction with coworkers, and occasional
> superficial interaction with the public.  He is limited to tolerating few changes in a
> routine work setting, and when said changes do occur, they . . . would need to
> take place gradually and occur infrequently.

(Tr. 202-03).  The VE said that the past positions would still be precluded, and the individual

could perform the same alternative work identified for the first hypothetical individual (with a

25% reduction in the number of housekeeping jobs available).  (Tr. 203).  The VE testified that if

either the first or second hypothetical individual also would be off-task 20 percent of the

workday and/or absent from work two days per month, they could not work.  (Tr. 204).  The VE

said that any greater than 15 percent off-task behavior or absences in excess of one day per

month would be work-preclusive.  (Tr. 204).

**IV.     The ALJ's Decision**

The ALJ's September 12, 2018, decision found that Scheall was not disabled from September 29, 2016, through the date of the decision and denied Scheall's claims for DIB and SSI.  (Tr. 16-31).  The ALJ found that Scheall had the severe impairments of "diabetes, lumbar displaced disc without myelopathy, mild to moderate degenerative joint disease of the bilateral hips, obstructive sleep apnea, obesity, hypothyroidism, hyperlipidemia, depression, anxiety, and post-traumatic stress disorder."  (Tr. 19).  But he found that Scheall did not have any impairment or combination of impairments that met or medically equaled criteria under the Listing of Impairments.  (Tr. 19).  And the ALJ found that Scheall had the RFC to perform a reduced range of light work, except that:

> he can occasionally use ramps and stairs, but can never use ladders, ropes, or scaffolds; he can occasionally balance, kneel, stoop, crouch, and crawl; he is restricted from hazards such as heights or machinery, but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles; he is limited to simple, routine, and repetitive tasks, but is not able to perform at a production rate pace (i.e. assembly line work), but he can perform goal-oriented work (i.e. office cleaner); he is limited to simple work-related decisions; he is limited to occasional interaction with coworkers, and to occasional, superficial interaction with the public; he is limited to tolerating few changes in a routine work setting, and when said changes do occur, they would need to take place gradually and occur infrequently.

(Tr. 22).

In assessing Scheall's RFC, the ALJ noted that:

> A final administrative decision on a prior claim was made on September 28, 2016.
> . . . [T]he undersigned has considered the prior findings made therein with regard to claimant's severe impairments, residual functional capacity, and past relevant work.  Although new and material evidence became available since the date of the last decision that indicates that the claimant now suffers from additional severe impairments (anxiety, post-traumatic stress disorder, hypothyroidism, and hyperlipidemia), his residual functional capacity and past relevant work have remained the same.  Therefore, the undersigned adopts the findings from the prior administrative law judge decision regarding residual functional capacity and past relevant work.

18

(Tr. 16).  The ALJ also stated that he had "considered all symptoms" in light of the medical and other evidence.  (Tr. 27).  The ALJ exhaustively summarized Scheall's hearing testimony and the evidence in the medical record.  (Tr. 23-27).  The ALJ specifically noted that: (1) Scheall had testified that he had chronic diarrhea and incontinence that prevented him from leaving the house, that over-the-counter medications did not help, and that he had received various diagnoses including that his diarrhea was stress-induced; (2) that objective medical imaging, physical examinations, mental status examinations, and therapy notes were generally unremarkable; (3) that he regularly reported feeling depressed, anxious, and preoccupied with his diarrhea, but he was generally alert and cooperative and said that treatment helped; and (4) that treatment notes indicated at times that he was pleasant, had coherent thought, had appropriate behavior, was able to focus, had intact memory, and was able to take trips outside his home by preparing for possible issues in advance.  (Tr. 23-27).  The ALJ also stated that he gave great weight to opinions from Dr. Haskins, Dr. Murry-Hoffman, Dr. Misja, Dr. Cruz, Dr. Green, and Dr. Ackley; partial weight to Toncler's opinion; and no weight to Dr. Koricke's opinion.  (Tr. 27-29).

Because the ALJ found that Scheall was unable to perform the full range of light work, he relied on VE testimony to determine whether Scheall was able to perform any work in the national economy.  (Tr. 30).  Based on the VE's testimony, the ALJ found that Scheall was "able to perform the requirements of representative occupations such as: an inspector hand packager; a cafeteria attendant; and a housekeeping cleaner."  (Tr. 30) (citations omitted).  Thus, the ALJ found that Scheall was not disabled and denied Scheall's claims for DIB and SSI.  (Tr. 30-31).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

20

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to

produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

>    **B.**    **RFC Finding**

Scheall's sole claim argues that the ALJ failed to reach a decision supported by substantial evidence in adopting the same RFC as the September 2016 ALJ decision and finding that he was able to perform a range of light work.  ECF Doc. 11 at 12-15.  Scheall asserts that new evidence had rectified the missing link between his psychological impairments and his uncontrolled incontinence, including: (1) gastroenterologist notes ruling out physical causes for his diarrhea and noting significant psychiatric history; and (2) mental-health counselor Toncler's opinion that Scheall's "anxiety worsens physical symptoms."  ECF Doc. 11 at 13-15 (citing Tr. 218-21, 491-93, 692, 782-83).  Further, Scheall contends that the ALJ did not adequately explain how he viewed the additional evidence in adopting the prior ALJ decision or how his finding of new severe impairments did not result in a departure from the previous RFC finding.  ECF Doc. 11 at 14.  Finally, Scheall argues that the uncontrolled incontinence and other symptoms evidenced in his new medical evidence would result in a work-preclusive number of absences. ECF Doc. 11 at 15.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in assessing Scheall's RFC.  ECF Doc. 12 at 14-19. The Commissioner argues that the ALJ complied with the regulations and *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cr. 2018), by giving a "fresh review" to all the evidence in the record and the prior ALJ decision.  ECF Doc. 12 at 15.  The Commissioner asserts that the ALJ adequately explained that he had considered the new and material evidence showing additional

impairments (anxiety, PTSD, hypothyroidism, and hyperlipidemia) that had become available after the prior ALJ decision.  ECF Doc. 12 at 14-15.  Further, the Commissioner contends that evidence in the record – including the state agency consultants' opinions and opinions from Dr. Misja and Dr. Ackley – supported the ALJ's RFC finding.  ECF Doc. 12 at 15-18.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

In *Earley*, the Sixth Circuit held that, although *res judicata* precludes revisiting a factual issue or disability ruling involving the same time period as a prior ALJ decision, it does not apply when an application seeks benefits for a distinct period of time.  893 F.3d at 933.  But the Court also noted that "[f]resh review is not blind review."  *Id.* at 934.  Thus, an ALJ evaluating a subsequent application for benefits may "consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Id.*

The ALJ applied proper legal standards in evaluating Scheall's RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Here, the ALJ complied with the regulations by considering all of Scheall's impairments – severe or otherwise – in light of the medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e); SSR 96-8p, 1996 SSR LEXIS 5.  Further, the

ALJ did not err in considering the September 2016 RFC finding or merely adopt the prior ALJ

decision on *res judicata* grounds.  *Earley*, 893 F.3d at 933-34.  Instead, the ALJ properly

included a review of the earlier decision along with his exhaustive review of the additional

medical records and opinions produced during the relevant period and adopted the same RFC

finding only after determining that the new evidence in the record did not establish a change in

Scheall's condition or abilities.  *Earley*, 893 F.3d at 933-34; (Tr. 16, 22-29).

The ALJ also did not fail to apply proper legal standards when he did not explain why his

finding of additional severe impairments at Step Two did not automatically result in the

assessment of additional functional limitations at Step Four.  At first glance, Scheall's

befuddlement here is understandable – it certainly seems inconsistent for an ALJ to find new

severe impairments without finding new limitations in the RFC.  Nevertheless, Scheall's

argument here is the result of a misunderstanding between the purpose of the Step Two severe-

impairment analysis and its narrow relationship to the Step Four RFC analysis.  In *Buck v.

Berryhill*, the Ninth Circuit was confronted with a similarly upset claimant and offered the

following explanation:

> Step two is merely a threshold determination meant to screen out weak claims.
> *Bowen v. Yuckert*, 482 U.S. 137, 146-47 (1987).  It is not meant to identify the
> impairments that should be taken into account when determining the RFC.  In
> fact, "[i]n assessing RFC, the adjudicator must consider limitations and
> restrictions imposed by all of an individual's impairments, even those that are not
> 'severe.'"  *Titles II & XVI: Assessing Residual Functional Capacity in Initial
> Claims*, Social Security Ruling ("SSR") 96-8p, 1996 SSR LEXIS 5, at *14 (July
> 2, 1996).  The RFC therefore should be exactly the same regardless of whether
> certain impairments are considered "severe" or not.

869 F.3d 1040, 1048-49 (9th Cir. 2017); *accord Griffeth v. Comm'r of Soc. Sec.*, 217 F.

App'x 425, 428 (explaining that Step Two is a *de minimis* hurdle meant to screen out "totally

groundless claims" by asking whether an impairment has "more than a minimal effect" on the

claimant's ability). In other words, while the functional limitations assessed in the Step Four analysis must be attributable to severe *and non-severe* medically determinable impairments, *see* SSR 96-8p, 1996 SSR LEXIS 5, at *7, the converse is not true. "A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other." *Yang v. Comm'r of Soc. Sec.*, No. 00-10446, 2004 U.S. Dist. LEXIS 16606, at *13 (E.D. Mich. 2004); *see also Griffeth*, 217 F. App'x at 428 (rejecting a claim that an ALJ's Step Four assessment was inconsistent with the Step Two severe impairment finding when the RFC did not contain independent limitations related to the claimant's severe impairment of depression). Certainly, a more in-depth explanation by the ALJ of the separate Step Two and Step Four standards would have been helpful to Scheall's understanding. But a review of the ALJ's written decision demonstrates that he accurately described the Step Two and Step Four standards and conducted the separate analyses separately. *See* (Tr. 17-18 (describing the Five Step analysis), 19 (Step Two analysis), 22-29 (Step Four analysis)). And, short of anticipating that Scheall would conflate the standards despite the ALJ's separate treatment of them, there is little more the ALJ could have done. Thus, notwithstanding Scheall's unforeseeable (but understandable) befuddlement, the ALJ's written decision drew an accurate and logical bridge between the evidence and his conclusions. *Fleischer*, 774 F. Supp. 2d at 877; *Sarchet*, 78 F.3d at 307.Substantial evidence also supported the ALJ's conclusion that Scheall's condition had not changed, and that he retained the ability to perform a reduced range of light work. 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek*, 139 S. Ct. at 1154. Here, substantial evidence supported the ALJ's conclusion that Scheall's condition had not changed, including: (1) that Scheall's primary argument for disability in his October 2014 claims was that his chronic diarrhea of undetermined cause precluded him from working, was related to his stress, and would cause him to be absent

from work; and (2) that the new medical evidence in the record indicated only that the cause Scheall's chronic diarrhea remained undetermined, was likely related to his stress, and made him anxious or fearful that an accident would occur if he left his home.  (Tr. 218, 487, 491-93, 521-23, 605-07, 621-23, 634-65, 691-92, 708, 717, 740-80, 834, 841-50).

Substantial evidence also supported the ALJ's conclusion that Scheall retained the ability to perform a reduced range of light work, notwithstanding his back pain, knee pain, chronic diarrhea, anxiety, and depression.[1]  Such evidence included: (1) Dr. Haskins', Dr. Murry-Hoffman's, Dr. Cruz's, and Dr. Green's opinions that Scheall could perform a range of light work with the same mental and physical limitations found in the ALJ's RFC; (2) Counselor Toncler's opinion that Scheall had only "none-mild" limitations in understanding, remembering, applying information, concentrating, persisting, maintaining pace, adapting, and managing himself; (3) Dr. Ackley's opinion that Scheall had normal memory, concentration, range of motion, coordination, gait, and strength; (4) Dr. Misja's opinion that Scheall was able to understand and remember institutions, could implement instructions, was friendly and chatty, had no bizarre or unusual thought content, and had only minimal limitations in attention, concentration, pace, responding to supervision and coworkers, and responding to work pressures; and (5) Dr. Thysseril's notes indicating that Scheall became less anxious with medication and counseling, was able to shop with his wife, could do chores at home, could remodel a basement, and retained coherent thought process and intact memory.  (Tr. 243-45, 280-81, 558-60, 563-67, 571-79, 583-84, 666-67, 670-73, 708-12, 783, 831-36).  Scheall is correct that other evidence

---

[1] Because Scheall argues only that the ALJ should have found additional limitations based on his chronic diarrhea and mental symptoms, any argument that additional limitations should have been assessed based on other symptoms is waived.  *See* ECF Doc. 11 at 12-15; *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010).  Nevertheless, as discussed above, substantial evidence supported the ALJ's evaluation of Scheall's physical symptoms.

could have supported greater limitations – including evidence that he had uncontrolled chronic diarrhea that made him apprehensive to leave his home for fear of accidents and evidence that steroid injections, medications, and physical therapy did not effectively relieve his pain.  *See* (Tr. 463, 487, 542, 634-65, 692, 717, 740-80, 788, 802, 841-50).  Nevertheless, even if most of the evidence favored greater limitations, this court cannot second-guess the ALJ's RFC assessment because substantial evidence supports it.  *Biestek*, 139 S. Ct. at 1154; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241.  Because the ALJ's RFC assessment was reasonably drawn from the record, it fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Even if we were to conclude that Scheall's other evidence amounted to a preponderance of the evidence, we would still be required to affirm the Commissioner's decision because substantial evidence supported it.  *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15.

Because the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Scheall's RFC, the ALJ's finding that Scheall retained an RFC to perform a reduced range of light work with the limitations assessed must be affirmed.

## VI. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Scheall's applications for DIB and SSI be AFFIRMED.

Dated: October 1, 2020

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).